**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2042**

———————

SHELLEY C.,

Plaintiff – Appellant,

v.

COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,

Defendant – Appellee,

and

SOCIAL SECURITY ADMINISTRATION RECORD; US ATTORNEY SOCIAL SECURITY NOTICING,

Parties-in-Interest.

———————

Appeal from the United States District Court for the District of South Carolina, at Florence. Terry L. Wooten, Senior District Judge.  (4:20-cv-01695-TLW)

———————

Argued:  October 27, 2022                    Decided:  February 22, 2023

———————

Before GREGORY, Chief Judge, WYNN, Circuit Judge, and FLOYD, Senior Circuit Judge.

———————

Reversed and remanded with instructions by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Wynn and Judge Floyd joined.

———————

**ARGUED:**  Robertson H. Wendt, Jr., FINKEL LAW FIRM, LLC, North Charleston, South Carolina, for Appellant.  Maija DiDomenico, SOCIAL SECURITY ADMINISTRATION,

Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Sarah H. Bohr, BOHR & HARRINGTON, LLC, Atlantic Beach, Florida, for Appellant.  Brian C. O'Donnell, Regional Chief Counsel, Thomas Moshang, Supervisory Attorney, Office of the General Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania; Corey F. Ellis, United States Attorney, Marshall Prince, Assistant United States Attorney, Columbia, South Carolina, for Appellee.

GREGORY, Chief Judge:

Plaintiff-Appellant Shelley C. appeals the district court's order affirming the Social Security Administration's ("SSA") denial of her application for Social Security Disability Insurance ("SSDI"). In her application, she alleged, *inter alia*, major depressive disorder ("MDD"), anxiety disorder, and attention deficit disorder ("ADHD"). Following a formal hearing, the Administrative Law Judge ("ALJ") determined that Shelley C. suffered from severe depression with suicidal ideations, anxiety features and ADHD, but he nonetheless denied her claim based on his finding that she could perform other simple, routine jobs and was, therefore, not disabled. Shelley C. contends that the ALJ erred by (1) according only little weight to the opinion of her long-time treating psychiatrist, Dr. Mark Beale ("Dr. Beale") and (2) disregarding her subjective complaints based on their alleged inconsistency with the objective medical evidence in the record.

We agree with Shelley C. that the ALJ failed to sufficiently consider the requisite factors and record evidence by extending little weight to Dr. Beale's opinion. The ALJ also erred by improperly disregarding Shelley C.'s subjective statements. Finally, we find that the ALJ's analysis did not account for the unique nature of the relevant mental health impairments, specifically chronic depression. Thus, we reverse and remand with instructions consistent with this opinion.

3

I.

A.

Before proceeding to the record in this case, we provide a brief overview of the step-by-step evaluation process used to decide whether a claimant is disabled.

When a claimant files for SSDI benefits, she must show the existence of a "medically determinable physical or mental impairment" which has persisted for at least twelve months and prevented participation in "substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). The Code of Federal Regulations instructs ALJs to apply a sequential five-step test before benefits may be extended. The process is provided in a set order and a claimant's failure at any step will disqualify her from benefits. *See* 20 C.F.R. § 404.1520(a)(4)(i)–(v).

At step one, the ALJ considers a claimant's substantial gainful activity ("SGA")—*i.e.*, whether the claimant has been working. If the claimant has, that ends the inquiry and the ALJ will find that the claimant is not disabled regardless of medical condition, age, education, or work experience. If not, the ALJ will evaluate the medical severity of the claimant's impairments under step two. A claimant must have an impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activities. Otherwise, the claimant will not be deemed disabled. To answer that question, the ALJ looks to the claimant's age, education, and work experience. At step three, the ALJ—once again observing the medical severity of the claimant's impairments—must determine whether the claimant has an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If a claimant's impairment (or combination of impairments) meets or equals a

4

listed impairment in Appendix 1, the ALJ will find the claimant disabled without consideration of the claimant's age, education, and work experience. However, if the claimant's impairment(s) do not meet or equal a listed impairment, the ALJ will reach a decision regarding the claimant's residual function capacity ("RFC") based on all the relevant medical and other evidence found in the record. Next, under step four, the ALJ considers the claimant's RFC and whether the record evidence shows that her alleged disability inhibits her ability to perform her past relevant work. And finally, step five requires the ALJ to decide whether the claimant has the ability to adjust to other work depending on her RFC, age, education, and work experience. *See id.* 20 C.F.R. § 404.1520(a)(4)(i)–(v). The claimant has the burden of proving the first four steps, but the burden shifts to the Commissioner at the final, fifth step. *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).

## B.

Shelley C., a 55-year-old woman and mother of two, resides with her husband of thirty years in South Carolina. After completing her first year of college, Shelley C. began her career primarily serving as a Preschool Director in different Baptist churches. Most recently, Shelley C. worked as a preschool's Director of Religious Activities from 2013 to 2016. However, after intentionally overdosing on painkillers and her antianxiety and antidepressant medications on July 30, 2016, Shelley C. left her job and filed for SSDI benefits shortly thereafter.

Shelley C.'s struggle with depression began at 18 years old. When she was in her early 30s, she actively started seeing her long-time treating psychiatrist, Dr. Beale, who diagnosed her with major depression, dysthymia, and ADHD.

During the SSDI benefits process, Shelley C. was diagnosed with endogenous depression. Though an outdated term which is now rarely diagnosed, endogenous depression is "any depressive disorder occurring in the absence of external precipitants and believed to have a biologic origin." *Stedman's Medical Dictionary* 238280 (28th ed. 2014). Although once distinct, endogenous depression is now classified and diagnosed as major depressive disorder ("MDD").[1] Shelley C.'s SSDI benefits application alleged MDD which is characterized by "sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness." *Stedman's Medical Dictionary* 238320 (28th ed. 2014). The diagnostic criteria for a major depressive episode, found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), reports "a depressed mood, a marked reduction of interest or pleasure in virtually all activities, or both, lasting for at least 2 weeks." *Id.* Three or more of the following symptoms must exist: "gain or loss of weight, increased or decreased sleep, increased or decreased level of psychomotor activity, fatigue, feelings of guilt or worthlessness, diminished ability to concentrate, and recurring thoughts of death or suicide." *Id.* Shelley C.'s treatment notes reflect both endogenous depression and major depressive disorder diagnoses. A.R. 51, 56, 424, 478.[2]

---

[1] *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 205 [DSM-III] (3d ed. 1980).

[2] Citations to "A.R." refer to the case's administrative record.

6

Although the earliest treatment notes in the record date back to 2015, Shelley C.'s relationship with her psychiatrist, Dr. Beale, was established years prior in 1999. As her long-term treating psychiatrist, Dr. Beale regularly transcribed notes concerning Shelley C.'s mental state, as well as her moods and affects. His treatment notes reveal that—at least since 2015—Shelley C. has struggled with severe mental health impairments, which have constantly ebbed and flowed. Dr. Beale prescribed, and often balanced, varying medications simultaneously, in an attempt to abate Shelley C.'s mental health symptoms.

In addition to Dr. Beale, Shelley C. sought treatment from her psychotherapist, Hillary Bernstein ("Bernstein"). Dr. Beale's and Bernstein's notes, both pre- and post-overdose, reflect a constant waxing and waning of depressive and anxiety-based symptoms. Throughout their sessions with Shelley C., both Dr. Beale and Bernstein consistently described her mood and affect as "dysthymic," "low," "tearful," or "so-so." A.R. 363, 366, 392–93, 451, 457, 598, 600, 603, 606. Her ability to perform household duties often wavered due to low motivation, and she suffered from constant crying spells. Regardless of events that brought temporary periods of joy—such as leaving town with her husband, visiting colleges with her daughter, and enjoying time with her nieces and nephews— Shelley C. still had the strong recurrent desire to self-isolate, sleep, and cry. Although Shelley C. later admitted that her intentional overdose was indeed a suicide attempt, one theme remained constant in her earlier treatment notes: she was adamant that she would not take her own life because she could not do that to her children.

In a handful of sessions, Shelley C.'s mood appeared improved and brighter. She claimed her medications were helpful, and she attempted to involve herself in various

7

activities.  Though not simultaneously, she began attending an art class with her mother-in-law, joined swimming aerobics with a friend, and participated in daily walks with her husband and service dog.  Shelley C. also often spoke about her body-image issues and her struggle to lose weight.  She made several attempts to sustain a Weight Watchers dieting program, and her happiness often paralleled her weight loss progress.

However, most, if not all, of these periods of improvement were short-lived; Shelley C. usually spiraled into deepened periods of heightened anxiety and depression mere days after she vocalized her improvement.  As much was clear on July 30, 2016, when Shelley C. was admitted to Roper's Hospital after an intentional medication overdose.  Her hospital intake form reflected:  "a long-standing history of depression . . . she was attempting to 'have a deep sleep' . . . [and] denies any suicidal ideation stating that she simply wanted to get a good night sleep."  A.R. 301.  Notes from a psychiatric evaluation state:  "[p]ositive for depression, suicide gesture."  *Id.*  The following morning, social services indicated that:

> [S]he has depression . . . sees a psychiatrist, Dr. Mark Beal [sic], weekly, and she has been going to him for 20 years . . . took the medication to knock herself out.  Pt did admit that a part of her was hoping that she would not wake up.  Pt stated that she wishes she were dead on a daily basis.  Pt has given to thought of how she would kill herself.  Pt stated that when she drives she thinks about hitting a tree or driving off the bridge.  Pt also stated that she has thought about a gun, but she does not know much about them and does not want it to be messy for her family . . .  Pt stated that if she were to actually kill herself, she would take a Zofran so she would not get sick and then she would overdose on pills.  Pt stated that she does not intend to act on these plans because of the responsibility she has to her children and family . . .  Although pt has described plans of how she would hurt herself, she is presently contracting for safety and does not intend to follow through with any of her plans . . .  An appropriate discharge plan would be to continue outpatient treatment with Dr. Beal [sic].

A.R. 309.  However, regardless of Shelley C.'s alarming statements, she was discharged the following day, diagnosed with "overdose without SI [suicidal ideations]."  A.R. 308.

Because her symptoms continued to waver despite her therapy and constant medication adjustment, Dr. Beale urged Shelley C. to pursue either Electro Convulsive/Shock Therapy ("ECT") or Transcranial Magnetic Stimulation ("TMS") therapy.[3]  After a consultation in April 2017, doctors associated with TMS therapy determined that Shelley C. suffered from both major and recurrent depression and that she was a "good" candidate for the treatment "given severity of depression [and] failure of medication trials."  A.R. 470.  Shelley C. officially began her 36 TMS treatments on May

---

[3] TMS is a noninvasive procedure that "uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression . . .  [It] is typically used when other depression treatments haven't been effective." *Mayo Clinic*, *Transcranial magnetic stimulation* (Nov. 27, 2018), https://www.mayoclinic.org/tests-procedures/transcranial-magnetic-stimulation/about/pac-20384625 (last viewed January 18, 2023) (saved as ECF attachment).  ECT is given to patients with severe, treatment-resistant depression and is performed under general anesthesia, with "small electric currents . . . passed through the brain, intentionally triggering a brief seizure.  ECT seems to cause changes in brain chemistry that can quickly reverse symptoms of certain mental health conditions." *Mayo Clinic*, *Electroconvulsive therapy (ECT)* (Oct. 12, 2018), https://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/about/pac-20393894 (last viewed January 18, 2023) (saved as ECF attachment).

16, 2017, at which she had a PHQ-9 score of 27.[4]  By the time her treatments concluded in mid-July, her score dropped to 9, demonstrating a significant improvement.[5]

Yet, as was common with her previous periods of progress, these positive results were fleeting, and Shelley C. quickly slipped back into a depressive state, plagued with melancholy, lethargy, and self-deprecating thoughts just weeks after finishing her final TMS session.  Even though Dr. Beale recommended a second round of TMS treatment, Shelley C. decided not to pursue it.  Desiring a break from psychotherapy, she later discontinued sessions with Bernstein yet still struggled with crying spells, poor concentration, anxiety, and depression-related affects.

On August 23, 2016, Shelley C. filed for SSDI benefits claiming that her disabilities began on August 1, 2016, the day following her release from Roper's Hospital.

---

[4] A PHQ-9 or Patient Health Questionnaire is the "depression module" of a self-administered diagnostic instrument common for mental disorders.  It is a "reliable and valid measure of depression severity."  Kurt Kroenke, Robert Spitzer, Janet Williams, *The PHQ-9, Journal of General Internal Medicine* (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last viewed January 18, 2023) (saved as ECF attachment).

[5] Hospital personnel indicated that Shelley C. expressed the following during her TMS sessions:  "I actually feel like I am starting to feel better, I'm scared to say that.  But I woke up without the impending doom feeling, still having concentration issues, sleeping well trying to not sleep 14 hours a night."  A.R. 510.  However, her condition seemed to plateau after this revelation, and her treatment was subsequently increased "due to lack of improvement."  *Id.*  This increase appeared to benefit Shelley C. and she reported at her June 29 appointment:  "thank God my anxiety and depression are starting to get better."  *Id.*  Her mood seemed to dip for a period after this particular treatment but by her second-to-last appointment she stated:  "I can really tell that TMS has helped me out a lot and my depression is so much better."  *Id.*

C.

Shelley C. submitted answers to a Form SSA-3373-BK ("Function Report")—which assists the SSA in understanding the claimant's conditions—provided by a branch of the SSA. In her answers, Shelley C. emphasized that: "Most days I cannot get out of bed . . . My 20 y[ea]r old son takes up the slack. I go nowhere because I don't have the strength . . . I cry all day . . . I constantly think about suicide." A.R. 204. She also reported that she "cannot talk to people without crying," A.R. 209, "can put in a load of laundry every once in awhile but [she] cannot dry, fold and put up," A.R. 210, and "[she has] no strength." A.R. 211. Shelley C. also reported that she went outside "[o]nce a day to pick up [her] daughter from school," A.R. 211, and she had "no desire to do any" of her former hobbies or interests A.R. 212. Despite her condition, she stated that on a regular basis she used to go to "[w]ork 6 days a week, [c]hurch, [e]xercise [c]lass, grocery store, [kids'] school events, out to dinner." A.R. 212.

In December 2016, Shelley C. reported to the SSA that her medical conditions had changed. She stated that she now spent her "days in the bed and cannot accomplish anything," could "make it to the couch if . . . forced," no longer "interact[ed] with family or friends," and could not "do any activities because it [was] too taxing on [her] body and heart." A.R. 231. She also expressed that she had "no quality to [her] life" and did not "participate in activities with [her] family and/or friends. Most days [she did] not shower or get dressed." A.R. 235.

On January 11, 2017, the SSA instructed Shelley C. to complete a comprehensive disability evaluation with a consultative physician, Dr. Thaddeus J. Bell ("Dr. Bell"). He found:

11

[t]here is a good chance that the patient is experiencing some element of empty nest syndrome. However, I feel that this is only part of a problem of endogenous depression which she continues to deal with. In spite of being happily married, she feels that life is not worth living. She feels suicidal almost every day. She states that the only reason that she has not tried to take her life is because of her children at this point.

A.R. 423. Dr. Bell acknowledged that Shelley C.'s physical examination was completely normal but stated that she needed to be seen by a disability services psychiatrist for evaluation.

On January 19, 2017, Dr. Jennifer Steadham—a government medical consultant who did not personally examine or treat Shelley C.—opined that Shelley C. was not disabled and, though she would have difficulty carrying out detailed instructions, she

[i]s capable of performing simple tasks for at least two hour periods of time. She would be expected to occasionally miss a day of work secondary to her symptoms. She is expected to have difficulty working in close proximity or coordination with co-workers. She would be best suited for a job which does not require continuous interaction with the general public. She is capable of single, repetitive tasks without special supervision. She can attend work regularly and accept supervisory feedback.

A.R. 63–65. After Shelley C. filed a request for reconsideration, Dr. Blythe Farish-Ferrer—a second, non-examining doctor hired by the government—affirmed Dr. Steadham's decision on June 21, 2017.

On May 19, 2017, Shelley C. completed a second Function Report. She updated the SSA about her ongoing, daily TMS therapy and her worsening symptoms. She lamented that: she was "dibilitated [sic] by depression . . . cannot get out of the bed and work or even focus." A.R. 238. She also reported that she had "gained about 40 pounds" (A.R. 239); "w[oke] up and [took] a handful of prescription medicine then . . . [laid] on the couch to rest then go to bed and sleep off and on all day" (*Id.*); had "no drive or interest"

12

to do house or yard work (A.R. 241); could not "focus on serious issues" (*Id.*); was "very moody to everyone" and "no longer socialize[d]" (A.R. 243); and could not "remember things or follow simple instructions." *Id.*

### D.

Shelley C.'s official hearing with an ALJ was held on August 7, 2018. Providing further color to her mental health impairments, she described her debilitating symptoms and vegetative state. She confessed that her July 2016 "accident" was a suicide attempt. A.R. 38. She testified that she no longer cooked or did household chores, and she claimed she could not do anything or go anywhere. Shelley C. also revealed that the TMS treatment did not aid her beyond a short-lived period and that she constantly had an impending feeling of doom. Her time outside of the house was extremely limited, only leaving once every three weeks for doctor's appointments. She reported that she has had more "bad" than "good" days, though, on occasion, she experienced some decent days. A.R. 44. Her depression has led to deep feelings of guilt, which often led to crying spells as often as every other day. She stated that she experienced thoughts about death and suicide daily and believed that her future was behind her. Because of this, Shelley C. claimed she would not be a dependable worker as she could not get up every day to attend work, where she would be required to focus and concentrate.

Following Shelley C.'s testimony, the ALJ posed hypotheticals to the testifying vocational expert. The vocational expert opined that though Shelley C.'s limitations prohibited her from performing her past work as a Director of Religious Activities, other jobs were available, such as: hand packager, store laborer, and laundry worker. Yet, when

13

the ALJ asked the vocational expert whether a person with Shelley C.'s psychological impairments—someone who could be distracted off task from their job for more than an hour a day, needed to take regular breaks, and would potentially miss more than two days of work a month on a regular basis—could perform such work, the vocational expert responded that *no jobs* were available with these criteria. At the hearing's conclusion, the ALJ requested that Shelley C. undergo a consultative examination.

On August 21, 2018, before the consultative examination took place, Dr. Beale submitted a medical opinion letter in support of Shelley C.'s claim. He summarized what was already reflected in his treatment notes: that Shelley C.'s depressive symptoms were severe and persistent, ranging from uncontrollable crying spells to low concentration, which "have made her unemployable." A.R. 610. Even with "robust" treatment, Dr. Beale stated that "[h]er progress is guarded due to the number and severity of episodes." *Id.* Due to her condition Dr. Beale opined that "the added stress of any job would very likely worsen her condition." *Id.*

Shelley C. was also examined by Dr. John Custer for a Mental Status Examination on September 24, 2018. He diagnosed her with persistent depressive disorder, potential maladaptive personality function, and, potentially, an unspecified personality disorder. Notwithstanding his diagnosis, Dr. Custer stated that Shelley C. was alert and oriented during the cognitive exam, followed commands, and scored well on the Folstein Mini-mental Status Exam—a commonly used instrument for testing cognitive ability. Dr. Custer reported to the SSA that Shelley C. did not have any issue with understanding, remembering, and carrying out simple instructions, or making judgments on simple work-related decisions. But Shelley C. did have mild issues with complex instructions, and she

14

displayed moderate issues making judgements on complex work-related decisions. He also determined that Shelley C. did not have any problem with interacting appropriately with the public; she displayed mild issues interacting appropriately with supervisors and co-workers; and she had moderate issues responding appropriately to usual work situations and changes in a routine work setting.

## E.

On February 12, 2019, the ALJ denied Shelley C.'s request for SSDI benefits. He held that Shelley C. carried her burden at steps one and two of the test set forth in 20 C.F.R. § 404.1520(a)(4), finding (1) she had not been involved in substantial gainful activity at the time of her request and (2) her depression with suicidal ideation, anxiety features, and ADHD were severe impairments. But the ALJ found her evidence lacking at step three. Specifically, he found that her severe mental impairments did not meet the relevant listing disability criteria for mental disorders. Even if Shelley C. had prevailed at this point, the ALJ noted that she could not pass step four either. The ALJ found that Shelley C. still possessed the capacity to perform simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions, and few if any workplace changes, with occasional interaction with the public. Based on this finding, the ALJ held that Shelley C. did not have a disability as defined in the Social Security Act, and though she was unable to perform her past relevant work, there were jobs in the national economy she could execute.

Remarkably, the ALJ afforded only little weight to Dr. Beale's opinion after acknowledging that Dr. Beale had been treating Shelley C. "since at least July 2015 for her

15

mental impairments." A.R. 24. The ALJ rejected Dr. Beale's opinion because it is "on an issue reserved for the Commissioner," "is inconsistent with the medical evidence [in the] record," and his treatment notes "do not indicate any significant symptoms that would render the claimant unable to perform basic work activities." *Id.*

On February 26, 2020, the Office of Appellate Operations denied Shelley C.'s request for review. Shelley C. subsequently filed a complaint in the United States District Court for the District of South Carolina seeking review of the Commissioner's final decision. On May 18, 2021, a magistrate judge issued a 42-page Report & Recommendation ("R&R") affirming the ALJ's denial of SSDI benefits. After Shelley C. objected to the R&R, a district court judge adopted it and ordered the Commissioner's denial of Shelley C.'s SSDI benefits. Shelley C.'s appeal timely followed.

## II.

"This Court is authorized to review the Commissioner's denial of benefits under 42 U.S.C.A. § 405(g)." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). A reviewing court "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Id.* (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). We will not "reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]" in reviewing for substantial error. *Johnson*, 434 F.3d at 653. In undertaking

16

this review, this Court considers whether the ALJ examined all relevant evidence and offered a sufficient rationale in crediting certain evidence and discrediting other evidence. *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998).

### III.

We start by considering whether the ALJ's decision to afford Dr. Beale's opinion little weight complies with applicable law and is supported by substantial record evidence. In deciding not to give great or controlling weight to Dr. Beale's opinion, the ALJ is required to address each of the six 20 C.F.R. § 404.1527(c) regulatory factors to determine the appropriate weight it should be afforded. Shelley C. contends that not only did the ALJ fail to address each of the six factors, but also that substantial evidence does not support the ALJ's finding because Dr. Beale's opinion: (1) was not on an issue reserved for the Commissioner; (2) was consistent with his treatment notes which confirm Shelley C.'s significant limitations; and (3) was not inconsistent with other medical evidence in the record. We find the weight afforded to Dr. Beale's opinion erroneous and the ALJ's decision unsupported by substantial evidence.

### A.

As a preliminary matter, the ALJ did not afford Dr. Beale's opinion proper weight. When reviewing whether a claimant is disabled, the ALJ must evaluate every medical opinion received against the record evidence. *See* 20 C.F.R. § 404.1527(b)–(c). This often entails reviewing medical opinions from a claimant's treating physician or other, non-

17

treating physicians.  Generally, ALJs possess the discretion to determine the level of weight given to each medical opinion provided and received.  *See* 20 C.F.R. § 404.1527(d)(2).

The regulation states that "[r]egardless of its source, [the ALJ] will evaluate every medical opinion[.]"  20 C.F.R. § 404.1527(c).  In addition, ALJs must adhere to the "treating physician rule" which requires that they assign greater or "controlling" weight to the opinion of a claimant's treating physician unless there is persuasive contradictory evidence.  *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983).  If the ALJ decides not to give the treating physician's medical opinion great or controlling weight under the treating physician rule, the ALJ turns to the following factors to determine its applicable weight:  (1) the length of the physician's treatment relationship with the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) whether the medical evidence in the record supports the physician's opinion, (5) the consistency of the physician's opinion with the entirety of the record, and (6) the treating physician's specialization.  20 C.F.R. § 404.1527(c)(1)–(6); *see also Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (unpublished).[6]

Here, the ALJ extended "little weight" to Dr. Beale's opinion after concluding that it "is on an issue reserved for the Commissioner and . . . is inconsistent with the medical evidence of record.  [His] treatment notes do not indicate any significant symptoms that would render [Shelley C.] unable to perform basic work activities."  A.R. 24.

---

[6] Because Shelley C. filed her claim prior to March 27, 2017, the ALJ must rely upon 20 C.F.R. § 404.1527 to evaluate the opinion evidence.  All claims filed after March 27, 2017, are subject to 20 C.F.R. § 404.1520.

18

The ALJ's reasoning suffers two problems. First, it failed to identify which medical evidence in Shelley C.'s extensive record presented inconsistencies with Dr. Beale's opinion. As we held in *Arakas v. Commissioner, Social Security Administration*, this "cursory explanation [falls] far short of [the ALJ's] obligation to provide a narrative discussion of how the evidence supported his conclusion and as such, the analysis is incomplete and precludes meaningful review." 983 F.3d 83, 106 (4th Cir. 2020) (citing *Monroe v. Colvin*, 826 F.3d 176, 190–91) (4th Cir. 2016) (cleaned up).

However, the second blemish in the ALJ's reasoning is more problematic. After declining to apply the "treating physician rule" it failed to address each of 20 C.F.R. § 404.1527(c)'s six factors. The ALJ appropriately "acknowledged the existence of the Section 404.1527(c) factors," *Dowling v. Commissioner of Social Security Administration*, 986 F.3d 377, 385 (4th Cir. 2021), but he nonetheless failed to address them. Mere acknowledgement of the regulation's existence is insufficient and falls short of the ALJ's duties.

That is not to say that the ALJ considered none of the factors.[7] Shelley C. concedes that the ALJ addressed "supportability" by noting that Dr. Beale's opinion was inconsistent with the medical evidence in the record which did not indicate significant symptoms that

---

[7] Invoking the fifth factor, Shelley C. argues that the ALJ failed to consider or explicitly mention Dr. Beale's specialization. Not so. The first page of the ALJ's opinion reveals that he was cognizant of and did describe Dr. Beale as Shelley C.'s psychiatrist. *See* A.R. 14 ("Subsequent to the hearing, the claimant . . . submitted a statement from the claimant's psychiatrist, Mark Beale, M.D."). Although more weight is generally given to a specialist's medical opinion on issues related to their specialty than to an opinion from a non-specialist, 20 C.F.R. § 404.1527(c)(5), the ALJ did acknowledge Dr. Beale's specialization but believed his opinion warranted little weight.

19

would render Shelley C. unable to perform basic work activities. From this discussion, we can infer that the ALJ was aware of the examining relationship that existed between Shelley C. and Dr. Beale, which satisfies 20 C.F.R. § 404.1527(c)'s first factor. The ALJ also appears to address the fourth factor, "consistency," as the ALJ recognized what he believed was the discrepancy between Dr. Beale's opinion and the entirety of the record. Further, the ALJ also acknowledged that Shelley C. was "seeing" Dr. Beale. A.R. 16. From this, we gather that the ALJ was aware of the examining relationship that existed between Shelley C. and Dr. Beale, thereby satisfying 20 C.F.R. § 404.1527(c)'s first factor.

That said, we have made clear in *Dowling* and *Triplett* that an ALJ should give adequate attention to each 20 C.F.R. § 404.1527(c) factor. *See Dowling*, 986 F.3d at 385 (reversing ALJ's extension of "only negligible weight" to the claimant's treating opinion because it touched on only a couple of factors); *Triplett v. Saul*, 860 F. App'x 855 (4th Cir. 2021) (unpublished) (same). Upon review of *all* the factors, however, the record supports extending Dr. Beale's opinion more than little weight.

Turning to the regulation's second factor, the ALJ improperly considered the length of Shelley C.'s treatment relationship with Dr. Beale and the frequency of her visits. If a treating source has seen a claimant a number of times and long enough to garner a longitudinal picture of the claimant's impairment(s), that source's opinion is generally entitled to more weight than an opinion from a non-treating source. 20 C.F.R. § 404.1527(c)(2)(i). Here, the ALJ noted that Shelley C. had been seeing Dr. Beale "since at least July 2015." A.R. 22. The record indicates that Dr. Beale has been Shelley C.'s psychiatrist for much longer, since 1999. It is difficult to understand how the ALJ could

20

ignore a treating relationship that has lasted the better part of two decades. Further, regardless of the ALJ's reliance on the record's extensive exhibits, he did not acknowledge that most of these notes were transcribed by Dr. Beale, demonstrating the breadth of Dr. Beale's personal involvement in this case.

Moreover, continuing the second factor's analysis, the ALJ improperly considered the nature, frequency, and extent of the treatment relationship between Shelley C. and Dr. Beale. The more knowledge a treating source retains concerning a claimant's impairment, the more weight their opinion should receive. 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ must consider the treatment that source has provided the claimant, including the extent of examinations and testing the source has performed or ordered other specialists and laboratories to perform. *Id.* Though the statement was not explicitly directed toward Dr. Beale, the ALJ maintained that Shelley C.'s treatment history was "routine and conservative." A.R. 22. That is simply untrue. After Shelley C. was released from Roper's Hospital following her intentional overdose in July 2016, she and Dr. Beale planned a rigorous treatment program with more frequent visits and medication management. When that was insufficient, Dr. Beale suggested that Shelley C. seek out TMS therapy or ECT treatment, two separate depression treatments that are offered only to patients with the most severe, resistant cases. Following through with the former treatment, Shelley C. completed 36 rounds of TMS therapy. However, the beneficial results were short-lived, and Dr. Beale suggested either a second round of TMS or the more aggressive ECT treatment. Thus, the treatments Shelley C. received, and was prescribed, were anything but routine and conservative.

21

The length, frequency, and nature of Shelley C.'s relationship with Dr. Beale were important factors that the ALJ did not properly consider nor acknowledge. Due to this, the ALJ's decision to allot "little weight" to Dr. Beale's opinion was erroneous.

B.

1.

Turning to the first of Shelley C.'s substantive concerns, we agree that Dr. Beale's opinion briefly touched on an opinion reserved for the Commissioner. Even so, that does not allow the ALJ to discount the entirety of the treating physician's statement, which should have been allotted greater weight.

Opinions on some issues are not medical opinions but are, rather, opinions reserved for the Commissioner "because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(d). This includes opinions, made by a medical source, concerning whether a claimant is disabled. A statement made by a medical source asserting that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is actually disabled. *Id.* Indeed, the ALJ will not give any special significance to the source of an opinion on issues reserved to the Commissioner.

In his opinion, Dr. Beale states: "[Shelley C.'s] low mood, crying spells, anxiety, low energy, and poor concentration have made her *unemployable.*" A.R. 610 (emphasis added). It would be a semantical dispute to argue that "unemployable" and "unable to work" are not synonymous. Yet, this statement was relegated to a minor portion of Dr. Beale's overall opinion, and at bottom, we cannot accept the decision to extend "little weight" to the *entire* opinion on this ground.

22

The Commissioner disagrees with Shelley C.'s argument that the ALJ discounted the entirety of Dr. Beale's opinion, claiming that the ALJ addressed other statements made by Dr. Beale when assigning the opinion miniscule weight. But the ALJ's decision does not isolate this sentence from the rest of the opinion. Rather, the ALJ merely refers to Dr. Beale's opinion—in its whole state—as addressing an issue reserved for the Commissioner. And given the ALJ's duty to balance the record's evidence, to disregard a 20-year treatment relationship due to a singular sentence is a disproportionate response. Thus, this aspect of the Commissioner's reasoning cannot be accepted.

2.

Next, we shift to the ALJ's belief that disparities exist between Dr. Beale's opinion and his own treatment notes. The ALJ specifically found that "Dr. Beale's treatment notes do not indicate *any significant symptoms* that would render [Shelley C.] unable to perform basic work activities." J.A. 18 (emphasis added).[8] The Commissioner agrees, asserting that Dr. Beale's treatment notes show Shelley C.'s unremarkable mental status findings, improvement in her symptoms and functioning due to treatment, and no signs of a significant deterioration in her condition during the relevant period. We disagree and conclude that the record's substantial evidence does not support the ALJ's reasoning.

Although the medical sources in the record disagree on Shelley C.'s disability status, substantial evidence indicates that Dr. Beale's opinion was consistent with his own treatment notes. Dr. Beale's opinion touches on Shelley C.'s diagnoses, their

---

[8] Citations to "J.A." refer to the Joint Appendix filed in this appeal.

23

accompanying symptoms, and the respective forms of treatment he prescribed. His treatment notes, in comparison, consistently focus on her diagnoses—depression with anxious features and ADHD—and their symptoms: dysthymic moods, anxiety, low energy, crying spells, self-doubt. *See* A.R. 363, 366, 369, 372, 380–81, 414, 416, 419, 436–38, 442, 598–600. These notes all validate what Dr. Beale stated in his opinion. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (holding that a claimant's treating physician's opinion may be given lesser weight *only if* persuasive contradictory evidence is found in the record).

The Commissioner challenges the validity of Dr. Beale's opinion by claiming that his treatment notes confirm that Shelley C. portrayed effective responsiveness to varying medication management and the TMS therapy. However, both Dr. Beale's treatment notes and his opinion demonstrate that these periods of improvement were consistently short-lived. For instance, at a treatment session, Shelley C. expressed to Dr. Beale that increasing her dosage of Zyprexa was "very helpful." A.R. 437. However, at the following session, her mood was recorded as low, she had a tearful affect, she reported crying spells, requested another Zyprexa increase, and sought to pursue ECT treatment. A.R. 436. The same pattern occurred after Shelley C. completed TMS therapy. At the treatment's conclusion, Shelley C. reported to the TMS-associated staff that she felt "so much better" and she was "so glad" to have tried TMS. A.R. 510. But just weeks later, she told Dr. Beale that her mood had plateaued and she was, again, relying on Zyprexa. A.R. 608. This common theme was prevalent throughout Dr. Beale's treatment notes: Shelley C. experienced brief periods of improvement, which were quickly followed by incredible lows. As Dr. Beale's opinion

24

aptly noted: Shelley C.'s depression is chronic. This Court must acknowledge that a treating relationship spanning two decades would allow Dr. Beale to witness and comprehend the depths of Shelley C.'s mental health impairments. And due to this decades-long awareness, Dr. Beale's opinion consistently aligns with his corresponding treatment notes.

Moreover, the ALJ's determination that Dr. Beale's notes did not reveal any significant symptoms that would hinder Shelley C. from performing basic work activities reflects a deep misunderstanding of mental health impairments, particularly severe depression. The fact is "people with chronic diseases can experience good and bad days" even "under continuous treatment for it with heavy drugs." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1267 (11th Cir. 2019). "Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job." *Id.* (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986)).

As an internal impairment, depression is incredibly subjective to each individual, with signs and symptoms experienced through intrusive feelings and thoughts, low and isolated moods, and even body aches and pains. *National Institute of Mental Health*, *Depression* (*Signs & Symptoms*), https://www.nimh.nih.gov/health/topics/depression (last viewed January 18, 2023) (saved as ECF attachment). Shelley C.'s "endogenous" depression, which occurs without external precipitants and is recognized as a biological disorder, plagues her thoughts, moods, feelings, and physical ability. Her depression has no identifiable external or situational trigger that would be treatable by coping mechanisms. Instead, Shelley C. experiences an

25

innate, chronic depression that will require life-long management, and that could easily impact her capacity to perform even basic work activities. As vividly portrayed in Dr. Beale's treatment notes, her chronic depression comes with both good and bad days, with the latter varying in their severity.

With these critical details in mind, we conclude that, consistent with his opinion, Dr. Beale's treatment notes reveal that Shelley C. suffers from significant and severe symptoms that would undoubtedly hinder her from performing even basic work activities.

3.

Finally, we address whether Dr. Beale's opinion was inconsistent with the record's other medical evidence. The Commissioner attempts to bolster the ALJ's conclusion that Dr. Beale's opinion was inconsistent with the other medical evidence in the record, particularly Bernstein's treatment notes, the TMS records, and the expert opinions from the examining psychiatrist and two non-treating physicians who reviewed the record. We recognize that a reasonable mind may find that Dr. Beale's opinion was inconsistent with the record's other medical evidence, particularly the non-examining physicians' findings, and therefore the ALJ was justified in not giving Dr. Beale's opinion controlling weight. Yet, we find error in the "little weight" afforded for two particular reasons. First, the ALJ failed to articulate what evidence led him to his decision. And second, the ALJ erred in extending more weight to the non-examining physicians' opinions than to Dr. Beale's.

i.

The ALJ failed to provide support for his vague and thin decision. This Court has held that where an ALJ fails to specify which specific objective evidence supports his

26

conclusion, that "analysis is incomplete and precludes meaningful review." *See Arakas*, 983 F.3d at 106 (quoting *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)).  Because the ALJ failed to point to specific objective evidence showing that Dr. Beale's opinion was "inconsistent" with the record's other medical evidence, his analysis, or lack thereof, has "frustrate[d]" this reviewing court's "meaningful review." *Mascio*, 780 F.3d at 636.

ii.

In addition, the ALJ inappropriately afforded more weight to Shelley C.'s non-examining physicians' opinion than to her treating physician's.  Even though we acknowledge the ALJ's decision not to extend controlling weight, it does not follow that we have accepted his conclusion to afford Dr. Beale's opinion only "little weight."

To be sure, the record demonstrates disparities between Dr. Beale's opinion and the non-examining physicians' conclusions, specifically Drs. Steadham and Farish-Ferrer.  Due to these inconsistencies, the ALJ was not required to extend controlling weight to Dr. Beale's opinion.  Yet, regardless of this finding, we believe the ALJ should have still afforded *greater* than "little weight" to Dr. Beale's opinion and extended more weight to his opinion than those of the non-examining physicians.  Under the 20 C.F.R. § 404.1527(c) factors, greater weight is usually given to the medical opinion of an examining source who has directly examined the claimant; a source that has treated the claimant; and a specialist in that relevant area of medicine.  *See Arakas*, 983 F.3d at 110–11 (citing 20 C.F.R § 404.1527(c)(1), (2), (5)).  In *Arakas*, we emphasized the treating physician rule as a "robust one," and particularly found that, "the ALJ's decision to assign greater weight to the non-examining, non-treating consultants' opinion" than to the treating physician's "makes little sense" and was not

27

justified. *Id.* at 110. There, giving the non-treating consultant's opinion more weight was "particularly improper" because the unique nature of the claimant's fibromyalgia and its specific symptoms could "not be properly assessed and verified by a non-treating or non-examining source." *Id.* at 110–11.

Our holding in *Arakas* is directly relevant here. Drs. Steadham and Farish-Ferrer, both non-examining, non-treating sources who independently reviewed Shelley C.'s record but did not directly examine her, concluded that despite her severe mental impairments, Shelley C. was not disabled. Finding their conclusions somewhat persuasive, the ALJ afforded their opinions "partial weight." A.R. 24. Particularly, he determined that their conclusions concerning Shelley C.'s moderate limitations in "Understanding, Remembering, or Applying Information, Interacting with Others, and Concentrating, Persisting, or Maintaining Pace" was consistent with the overall record. A.R. 18. However, finding that their decisions marked Shelley C. as experiencing no limitation in "Adapting or Managing Oneself," the ALJ determined that this conclusion was not consistent with the overall record, given Shelley C.'s testimony and other, unspecified, record evidence. *Id.*

We are puzzled by the ALJ's decision to extend greater weight to Drs. Steadham and Farish-Ferrer's opinion than to Dr. Beale's. Dr. Beale has treated Shelley C. for twenty years—much like the treating physician's relationship with the claimant in *Arakas*—whereas the former doctors never directly examined Shelley C.. Naturally, we expect that Dr. Beale would be astutely aware and privy to the uniqueness of Shelley C.'s specific, severe depressive and anxious symptoms, which non-treating agents are unlikely to

28

understand or decipher from a paper record.  There is a significant difference between a direct and physical examination, which in this case has spanned over years, of a claimant's mental health impairments, and an examination of a written record.  Thus, the ALJ erred by failing to consider the important distinctions between these treating and non-treating relationships and extending more weight to the non-examining physicians' opinions than to Dr. Beale's.

*** 

Because we remain in the dark about the reasons why the ALJ arrived at his conclusions, which erroneously afforded more weight to the non-examining physicians, we cannot uphold the ALJ's decision.  Thus, we conclude, the ALJ improperly afforded Dr. Beale's opinion "little weight" and we must reverse and remand.

IV.

Shelley C. also argues that the ALJ did not properly evaluate her subjective complaints.  The ALJ stated that Shelley C.'s:

> statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . they are inconsistent with the medical evidence of record, which reflects a routine and conservative treatment history, and generally benign mental status examinations.

A.R. 22.  Shelley C. contends that the ALJ's decision was erroneous because it was unsupported by the record's substantial evidence.  Specifically, she asserts that her level of treatment could not fairly be characterized as "routine and conservative" and her mental

29

status examinations illustrate repeated depressive, harmful, and suicidal thoughts, which are not "benign" in nature. We agree with Shelley C..

A.

The ALJ evaluates a claimant's symptoms through a two-prong framework found in SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), which is further elaborated in 20 C.F.R. § 404.1529. First, the ALJ must decide whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 2016 WL 1119029.

If the claimant clears this threshold, the ALJ then moves to the second prong, which involves evaluating the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. *Id.* At this second prong, the ALJ considers the "entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. However, "objective evidence is *not* required to find the claimant disabled." *Arakas*, 983 F.3d at 95 (citing SSR 16-3p, 2016 WL 1119029, at *4–5). In other words, the ALJ "will not disregard [a claimant's] statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, 2016 WL 1119029, at *5. Indeed, "because pain is subjective [it] cannot always be confirmed by objective indicia[.]" *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996). Instead, the ALJ

30

is required to balance the record evidence as "[a] report of . . . inconsistencies in the objective medical evidence is one of the many factors . . . consider[ed] in evaluating" this prong. SSR 16-3p, 2016 WL 1119029, at *5.

Finally, the ALJ must ascertain the extent of the claimant's alleged functional limitations and restrictions due to their pain or symptoms that could be reasonably accepted as consistent with the medical signs, laboratory findings, and other evidence, in discovering how these symptoms impact the claimant's ability to work. *See Craig*, 76 F.3d at 594.

1.

After acknowledging that Shelley C.'s "medically determinable impairment could reasonably be expected to cause some of the alleged symptoms," A.R. 22, the ALJ determined that Shelley C.'s statements relating to the intensity, persistence, and limiting effect of her symptoms were inconsistent with the medical and other evidence in the record. We hold that the ALJ erred in discounting Shelley C.'s subjective complaints as inconsistent with the record's medical evidence.

The ALJ's legal error is clear: he could not dismiss Shelley C.'s subjective complaints based *entirely* upon the belief that they were not corroborated by the record's medical evidence. The Fourth Circuit has long held that "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). Indeed, "[b]ecause pain is not readily susceptible of objective proof . . ., *the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative*." *Hines v. Barnhart*, 453 F.3d 559, 564–65 (4th Cir.

31

2006).  Accordingly, Shelley C. was entitled to rely entirely on subjective evidence to demonstrate that her pain was sufficiently persistent and severe to support a disability finding.  *See id.* at 564.  As described in length above, the record contains no shortage of such evidence.[9]

Shelley C.'s statements were also directly corroborated by her testimony at the ALJ hearing.  Because she reported being constantly clouded by an impending sense of doom, she mentioned that her daily routine consisted of swallowing a cocktail of pills followed by returning to her bed or the couch where she either slept or watched re-runs on TV all day.  She found it difficult to have conversations with others because she "tear[ed] up a lot."  A.R. 41.  She testified that her husband and children do all of the housework and her children no longer feel as if they have a mother.  Shelley C. stated that her symptoms have worsened, and she thinks about suicide and death everyday because there is no "light at the end of the tunnel."  A.R. 45.  For those reasons, she claimed she would not be a dependable employee because her "fatigue, memory loss, anxiety, and severe sadness" make it impossible for her to work.  A.R. 46.  Shelley C., at times, could not even find the words to express the level of her depression.  For instance, she testified, "I don't know how to

---

[9] In her applications for SSDI benefits, Shelley C. wrote that most days she could not get out of bed, as she no longer possessed the strength to go anywhere.  She was overwhelmed with crying spells—which also interrupted her ability to talk to others—and, on days with doctor's appointments, she could not do anything else due to this deep sadness.  Suicide haunted her thoughts constantly.  Regardless of her harmful thoughts, she managed to push aside her feelings to pursue things—as needed—for her children.  This is consistent with the copious treatment notes which reflected that, although her moods and affects were constantly dysthymic and depressed, she would not act on her suicidal thoughts due to her children.

32

explain. It's just a real deep, dark place where you don't feel like you'll ever come out of it. It just—I don't know." A.R. 47. Thus, Shelley C. has frequently and consistently disclosed how the pain and severity of her mental health impairments have impacted her life, her family, and her inability to be a reliable or dependable employee.

In *Arakas*, we held that ALJs could not rely upon the absence of objective medical evidence to discredit "a claimant's subjective complaints regarding symptoms of fibromyalgia *or some other disease that does not produce such evidence.*" 983 F.3d at 97 (emphasis added). Today, we hold that depression—particularly chronic depression—is one of those other diseases. Characterized as a "mood disorder," MDD "causes a persistent feeling of sadness and loss of interest . . . it affects how you feel, think and behave[.]" *Mayo Clinic*, *Depression (major depressive disorder) Symptoms & Causes* (Oct. 14 2022), https://www.mayoclinic.org/diseases-conditions/depression/symptoms-causes/syc-20356007 (last viewed January 18, 2023) (saved as ECF attachment). Notably, the DSM-V declares that "no laboratory test has yielded results of sufficient sensitivity and specificity to be used as a diagnostic tool for [MDD.]"[10] But most importantly, "[s]ymptoms caused by major depression can *vary from person to person.*" *Mayo Clinic*, *Depression (major depressive disorder) Diagnosis & treatment*, https://www.mayoclinic.org/diseases-conditions/depression/diagnosis-treatment/drc-20356013 (emphasis added) (last viewed January 18, 2023) (saved as ECF attachment). Stated differently, symptoms of MDD, like those of fibromyalgia, are "*entirely subjective*," determined on a case-by-case basis. *Arakas*, 983 F.3d at 96

_____

[10] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 187 [DSM-V] (5th ed. 2013).

(emphasis added). Ultimately, because of the unique and subjective nature of MDD, subjective statements from claimants "should be treated as evidence *substantiating* the claimant's impairment." *Id.* at 97–98.

Because the ALJ "improperly increased [Shelley C.'s] burden of proof," *id.* at 96, in requiring that her subjective statements be validated by objective medical support, we must find error.

2.

We must also assess the ALJ's decision to disregard Shelley C.'s subjective statements concerning the intensity, persistence, and limiting effects of her symptoms finding they, allegedly, were inconsistent with the medical evidence in the record, which, in his view, "reflect[ed] a routine and conservative treatment history, and generally benign mental status examinations." A.R. 22. We believe that substantial record evidence does not support this conclusion.

Following this statement, the ALJ chronologically walked through the treatment notes from Bernstein and Dr. Beale. In so doing, however, the ALJ cherry-picked from the record, highlighting Shelley C.'s good moments and bypassing the bad. This violated an ALJ's "obligation to consider all relevant medical evidence," which prohibits him from "simply cherrypick[ing] facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869. At the outset of his analysis, the ALJ inappropriately brushed off Shelley C.'s intentional overdose, which she admitted was a suicide attempt. Specifically, he noted that Shelley C. denied any suicidal ideations and said that she "simply wanted to get a good night sleep." A.R. 22. Although he acknowledged

34

that Shelley C. had described the plans on how she would end her life, he noted that she was safely discharged from the hospital one day after the overdose. While true, the ALJ failed to mention Shelley C.'s statement that an argument with her husband led her to take the handful of pills which landed her in the ER. Nor did the ALJ acknowledge that Shelley C. directly reported to Social Services that "a part of her was hoping that she would not wake up . . . she wishes she were dead on a daily basis." A.R. 309. This does not reveal a "benign mental status," yet the ALJ failed to mention or consider this critical information.

The ALJ's cherry-picking also pervaded his consideration of Dr. Beale's treatment notes. For example, the ALJ mentioned only that Shelley C. denied suicidal ideations, was able to enjoy things at times, performed all household duties, and had been regularly attending and enjoying water aerobics. However, other evidence indicated that Shelley C. performed her household duties because her family depended on her, and her motivation to complete them often wavered and eventually plateaued. And while Shelley C. did participate in water aerobics with a girlfriend, and an art class with her mother-in-law, those experiences and activities were few and far between, as they were discussed *in only a handful of Shelley C.'s many treatment notes*. A.R. 330, 449–50.

The ALJ also recounted a weekend visit Shelley C. had with her niece and nephew, which, according to Dr. Beale's treatment notes, she claimed to enjoy. Yet, the ALJ overlooked Shelley C.'s surrounding statements. Although Shelley C. told Bernstein at a psychotherapy session that she was able to enjoy being active with her niece and nephew over a period of their visit, Shelley C. continued to have a depressed mood and affect, and she reported a melancholic mood, low energy, poor motivation, and self-deprecating

35

thoughts *at the same psychotherapy session*. A.R. 506. At another point, the ALJ discussed Shelley C.'s capacity to enjoy a family wedding but failed to address that Shelley C. was reluctant to attend the wedding based on concerns about her appearance and weight. Indeed, Shelley C. often spoke about her struggle with weight and body image. Her success or failure to lose weight often corresponded with her depressive states. Again, the ALJ did not acknowledge or discuss this correlation or notable theme in Shelley C.'s record.

Further, the ALJ mischaracterized Shelley C.'s experience with the TMS treatment. Although he accurately discussed the decrease in her PHQ-9 score and the TMS's gradual positive effect on her moods, he failed to note how brief the improvements were. Of course, the TMS treatment notes revealed Shelley C.'s gratitude for her participation. But, within a month of completing the treatments, Shelley C. reported to both Dr. Beale and Bernstein that her mood was depressed, she experienced self-deprecating thoughts, lack of motivation, and lethargy, with intermittent periods of anxiety and worry. These statements were vital to providing a comprehensive image of the waxing and waning of Shelley C.'s chronic depression, which was treatment resistant.

At each step of Shelley C.'s poor mood and affect, Dr. Beale attempted to curb her symptoms with medication management. At multiple points, the record depicts Shelley C.'s medication adjustment, prescriptions for new medications, and the balancing and tapering of her existing medications. The medications Dr. Beale prescribed—Wellbutrin, Cymbalta, Ativan, Adderall, Zyprexa, and Progesterone—include, *inter alia*, atypical antidepressants, serotonin-norepinephrine reuptake inhibitors, benzodiazepines, and atypical antipsychotics. A growing number of district courts have held that in cases where

36

claimants consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend visits with mental health professions, and endure constant medication adjustment and management, their treatment is classified as anything but "routine and conservative."[11] Thus, at a minimum, Shelley C.'s constant medication management and sessions with Dr. Beale and Bernstein cannot be so classified.

When medication management did not appear to abate her symptoms with any longevity, Dr. Beale recommended that Shelley C. enroll in either TMS or ECT treatment. As mentioned above, these forms of treatment are only offered and administered to those with the most severe cases of depression. Dr. Beale did not prescribe these courses of treatment lightly. He had first-hand knowledge that the medication management was not sufficient to abate Shelley C.'s symptoms, which appeared to be worsening. Overlooking

---

[11] *See Edwin M. v. Saul*, No. 4:19-cv-00046, 2021 WL 1565415, *9 (W.D. Va. Apr. 21, 2021) (unpublished) (citing to similar cases and holding that, *inter alia*, where claimant was prescribed various antidepressants, anticonvulsants, and antipsychotics which were repeatedly changed due to the claimant's ongoing symptoms, the claimant's treatment could not be characterized as "routine" or "conservative"); *see also Za Xiong Mua v. Saul*, No. 1:19cv516, 2020 WL 5257592, at *8 (E.D. Cal. Sept. 3, 2020) (finding antidepressants, antipsychotics, and "frequent" visits with mental health professionals was "anything but conservative"); *James N. v. Saul*, No. ED CV 18-1199-KS, 2019 WL 3500332, at *6 (C.D. Cal. July 31, 2019) (concurring with "other district courts that have found antipsychotic medications such as Risperidone do not qualify as routine or conservative treatment"); *Wilson v. Colvin*, No. 8:15cv4185, 2016 WL 6471904, at *15 (D.S.C. Oct. 19, 2016) (rejecting ALJ's characterization of claimant's treatment as "conservative" where claimant treated with a psychiatrist, took psychotropic medications, and required repeated medication changes because of "ineffectiveness"); *Mason v. Colvin*, No. 1:12cv584, 2013 WL 5278932, at *6 (E.D. Cal. Sept. 18, 2013) (finding treatment not "conservative" where claimant took antidepressants and antipsychotics "to treat her depression, anxiety, and auditory and visual hallucinations," treated with a psychiatrist and psychiatric social worker, and continued to experience symptoms, including suicidal ideation, while taking her medication).

the extensive and nuanced treatment Shelley C. received, the ALJ inappropriately "play[ed] doctor in contravention of the requirements of applicable regulations," *Lewis*, 858 F.3d at 869 (cleaned up), by concluding that her treatment was "routine and conservative."

V.

The ALJ determined that Shelley C. was not disabled because she only presented "moderate limitations" under step three of the 20 C.F.R. § 404.1520(a)(4) analysis. However, the ALJ inadequately grappled with the unique nature of Shelley C.'s mental health impairments, particularly chronic depression. We believe that if analyzed correctly, Shelley C.'s depression demonstrated both marked and extreme limitations that would instantly qualify her as disabled. As such, we conclude that substantial evidence does not support the ALJ's decision that Shelley C. was not disabled.

A.

In *Arakas*, we held that the ALJ erred in denying the claimant's request for disability benefits by failing to properly understand the unique nature of fibromyalgia. We looked to SSR 12-2p's Evaluation of Fibromyalgia to conclude that "the ALJ failed to appreciate the waxing and waning nature of fibromyalgia and to consider the longitudinal record of Arakas's symptoms as a whole." *Arakas*, 983 F.3d at 101. Unlike for fibromyalgia, the social security rulings do not neatly elaborate upon evaluations concerning depression with suicidal ideation, anxiety features, and ADHD. However, in step three of the ALJ's required analysis, the SSA does detail, *inter alia*, mental health disorders nested within an extensive "Listing of Impairments." At that stage, the claimant is required to prove that

38

her impairment or combination of impairments meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that although Shelley C. suffered from severe mental impairments, she did not "meet or medically equal the criteria of listing 12.04, 12.06, and 12.11." A.R. 16. The SSA's listings for mental disorders are arranged in eleven categories.[12] The listings relevant here are: depressive, bipolar and related disorders (12.04), anxiety and obsessive-compulsive disorders (12.06), and neurodevelopmental disorders (12.11). Listings 12.04 and 12.06 have three paragraphs—labeled A, B, and C. A claimant must satisfy either the requirements in both paragraphs A and B or the requirements in both paragraphs A and C. 20 C.F.R. Pt. 404, Subpt. P, App.1. Listing 12.11, on the contrary, has only two paragraphs—characterized as A and B—and a claimant must satisfy the requirements of both. *Id.* For purposes of this Section, we will solely focus on Listing 12.04, pertinent to Shelley C.'s severe and chronic depression.

Paragraph A of these listings hosts the medical criteria that must be present in a claimant's medical evidence, whereas Paragraph B offers the functional criteria the ALJ assesses to evaluate how the claimant's mental disorders limit their functioning, in accordance with a rating scale (12.00E and 12.00F). More specifically,

---

[12] The categories include: Neurocognitive disorders (12.02); schizophrenia spectrum and other psychotic disorders (12.03); depressive, bipolar and related disorders (12.04); intellectual disorder (12.05); anxiety and obsessive-compulsive disorders (12.06); somatic symptom and related disorders (12.07); personality and impulse-control disorders (12.08); autism spectrum disorder (12.10); neurodevelopmental disorders (12.11); eating disorders (12.13); and trauma- and stressor-related disorders (12.15). 20 C.F.R. Pt. 404, Subpt. P, App. 1.

> [t]hese criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see §§ 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). *To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.*

20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added).[13]

Paragraph C of listings 12.04 and 12.06 specifies the criteria the ALJ uses to determine "serious and persistent mental disorders." *Id.* In order to qualify as "serious and persistent," the claimant must demonstrate "a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both" prongs of Paragraph C. *Id.*

Under the depressive, bipolar and related disorder listing (12.04), the claimant must satisfy either A and B, or A and C. Paragraph A requires medical documentation of depressive disorder characterized by five or more of the following: (a) depressed mood; (b) diminished interest in almost all activities; (c) appetite disturbance with change in weight; (d) sleep disturbance; (e) observable psychomotor agitation or retardation; (f) decreased energy; (g) feelings of guilt or worthlessness; (h) difficulty concentrating or thinking; or (i) thoughts of death or suicide. This must be satisfied in conjunction with:

---

[13] Here, the ALJ defined "marked limitation" as "serious limitation" of independent, appropriate, effective, and sustained basis functioning and "extreme limitation" as the "inability to function independently, appropriately or effectively, and on a sustained basis." A.R. 19.

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

**OR**

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added).[14]

---

[14] For the anxiety and obsessive-compulsive disorders listing (12.06), again, the claimant must meet either A and B, or A and C. Paragraph A requires medical documentation of anxiety disorder characterized by three or more of the following: (a) restlessness; (b) easily fatigued; (c) difficulty concentrating; (d) irritability; (e) muscle tension; or (f) sleep disturbance. *Id.* This paragraph must be met in combination with Paragraph B or C, the same language found under the 12.04 listing.

Lastly, concerning the neurodevelopmental disorders listing (12.11), the claimant must meet both Paragraphs A and B. Paragraph A specifies that the claimant must demonstrate, in accordance with the criteria listed in Paragraph B above:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:

1. One or both of the following:

a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or

b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").

2. Significant difficulties learning and using academic skills; or

(Continued)

B.

Substantial evidence does not support the ALJ's conclusion that Shelley C. did not meet or equal the relevant listing criteria. Instead, substantial evidence demonstrates that Shelley C. meets the disability criteria and therefore should be found disabled.

The ALJ failed to discuss whether Shelley C. satisfied any of the requirements found in Paragraph A of listings 12.04, 12.06, and 12.11. However, the ALJ did note that Shelley C.'s mental impairments were severe and "significantly limit the ability to perform basic work activities." A.R. 17. Although thin, we agree and infer that the ALJ's language demonstrates Shelley C.'s satisfaction of Paragraph A's criteria of the depressive disorder listing (12.04).

Moving along to Paragraph B, the ALJ insisted that Shelley C.'s severe mental impairments did not meet or medically equal the severity of one of the 12.04, 12.06, or 12.11 listings, noting that she suffered only from a "moderate limitation" in the four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. However, substantial evidence does not support this conclusion as the record's medical evidence demonstrates two "marked" limitations and one "extreme" limitation in these categories.

---

3. Recurrent motor movement or vocalization.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

First, we agree with the ALJ that Shelley C. demonstrates a moderate limitation in understanding, remembering, or applying information. This much is clear from the test Dr. Custer administered where Shelley C. followed a three-stage command, copied a geometric design, and recalled 3/3 objects after a minute and 1/3 after five minutes. But with respect to Shelley C.'s ability to interact with others, the record does not reveal a "moderate limitation," but rather a "marked limitation." Shelley C. was often unable to speak to others without a tearful affect. She did not leave the house for weeks at a time, apart from doctor's appointments once every three weeks, secluding herself to the couch each day. Moreover, her treatment notes describe Shelley C.'s constant desire to self-isolate. Outside of her immediate family, Shelley C. rarely interacted with others, particularly strangers. Any activities she joined—which either involved limited human interaction or were done with well-known individuals—do not demonstrate that Shelley C. was able to moderately interact with others, particularly individuals with whom she was not familiar. Instead, the record reveals that Shelley C. was a dysthymic, self-isolated, often tearful, worried person who struggled with social interaction. Shelley C.'s marked limitation in this area, supported by overwhelming evidence in the record, would inhibit her from performing "in an ordinary work setting on a regular and continuing basis" of "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-p, 1996 WL 374184, at *2.

Next, the ALJ found that Shelley C. had a moderate limitation in her capacity to concentrate, persist, or maintain pace. To reach that conclusion, the ALJ relied solely upon the record's medical evidence regarding Shelley C.'s "good attention and concentration at treatment visits," A.R. 20, and disregarded her subjective complaints. We find this reasoning

43

not only defective, but also insupportably weak. The record's substantial evidence parades a slew of instances concerning Shelley C.'s limited capacity to concentrate, persist, or maintain pace. Her inability to continue or complete new activities is also indicative of her shortcomings in persistence and maintaining pace. Shelley C. expressed her excitement to participate in new activities, as previously discussed, but the record clearly shows that each of those endeavors were brief, often only being spoken about for, at most, a handful of sessions. Thus, the ALJ improperly relied upon Shelley C.'s capacity to discuss her life outside of the doctor's office as medical evidence to challenge the gravity of this limitation.

Although we have found that Shelley C. reveals marked limitations in the preceding two functional areas (which is all that is required to find for a claimant's disability status), for a fulsome review, we analyze the final functional area: Shelley C.'s ability to adapt and manage herself. Alas, we conclude that Shelley C. displays extreme limitations in this area.

In reaching his decision, the ALJ pointed to Shelley C.'s capacity to count change, feed her pets and, on one occasion, Shelley C.'s report to her therapist that she had a good activity level and was able to follow through with her chores and responsibilities. The ALJ also relied on treatment notes indicating that Shelley C. appeared well-groomed during appointments. Yet, the ALJ's explanation provides a prime example of the misconceptions surrounding depression.

44

Per the DSM-V, depressive disorders, including MDD, are "accompanied by related changes that significantly affect the individual's capacity to function."[15]  When those with MDD face a depressive episode, it involves "clear-cut changes in affect, cognition, and neurovegetative functions and *interepisode remissions*," which are characterized by "pervasive unhappiness and misery."[16]  In other words, amidst a patient's depressive episodes, she is capable of experiencing brief periods of diminished depression, which can appear—from the outside looking in—as overall improvement.

The ALJ focused on Shelley C.'s "improved" periods to reject the lower, more frequent states of her depression which impacted her ability to adapt or manage herself. As the record reflects, Shelley C.'s daily routine often consisted of remaining in bed or on the couch, unbathed and in the same clothes.  Treatment notes state that her ability to do chores was either "problematic," "fair," or "improving."  A.R. 328–29.  Only once, which the ALJ fixated on, did Shelley C. report that she was able to complete all of her household tasks.  The only activity she did on her own was attend necessary doctor's appointments. Yet, Shelley C. detailed that on her appointment days, she would come home and cry, unable to participate or do anything else for the remainder of the day.  Adapting herself to change was also trying.  In therapy, she often lamented, through tears, her children leaving home.  Similarly, Shelley C.'s participation in new activities was fleeting, often impacted by her symptoms, demonstrating that this extreme limitation persisted.

---

[15] Am. Psychiatric Ass'n [DSM-V], *supra* note 10, at 177.
[16] *Id.* at 177, 184 (emphasis added).

Notably, the ALJ abandoned a critical piece of information. During Shelley C.'s hearing, the vocational expert stated that, not including her past work, there were other jobs that Shelley C. could perform. The ALJ utilized this portion of the vocational expert's testimony to support his finding that Shelley C. had the capability to perform simple, routine, repetitive-styled jobs. Strikingly, however, the ALJ disregarded a powerful segment of the vocational expert's testimony. When asked about a person with psychological impairments who would be off task from their job for more than an hour a day, in addition to regular breaks, and miss more than two days of work a month on a regular basis, the vocational expert vocalized that there were *no such jobs* in the national economy suitable for a person with such limitations. We are perplexed by the ALJ's dismissal of this significant testimony. Given Shelley C.'s daily routine, she cannot possibly be expected to attend, let alone perform, the jobs suggested. The waxing and waning of her symptoms would hinder her from being a dependable employee. These environments would place her in constant communication and interaction with strangers. They also would force her to be active, when Shelley C. reported being unable to move from her bed or the couch. The ALJ erred by disregarding the vital vocational expert testimony and finding that Shelley C. had the capacity to work.

Given our analysis, we will not "reflexively rubber-stamp [the] ALJ's findings," *Lewis*, 858 F.3d at 870, that Shelley C.'s severe mental health impairments do not rise to the disability criteria described in the relevant listing. As the reviewing court, we cannot "uphold the factual findings of the ALJ" because they were unsupported "by substantial evidence and were [not] reached through application of the correct legal standard."

46

*Hancock*, 667 F.3d at 472. Instead, Shelley C.'s two marked limitations and/or one extreme limitation meet the appropriate standard under the 12.04 listing to qualify her as disabled.[17]

## VI.

Today, we join our sister circuits' growing conversation surrounding chronic diseases, highlighting, in particular, the unique and subjective nature of chronic depression.

In light of the reasons set forth above, we conclude that the ALJ erred in assigning "little weight" to Dr. Beale's opinion and in disregarding Shelley C.'s subjective complaints. His decision not only presented several procedural errors but also failed to consider the record's substantial evidence and the unique nature of Shelley C.'s severe mental impairments, particularly her chronic depression.

Per 42 U.S.C. § 405(g), this Court has the power to reverse the Commissioner's decision with or without the cause for a rehearing. We, along with our sister courts, have awarded disability benefits without remand for rehearing "where the record clearly establishes the claimant's entitlement to benefits and another ALJ hearing on remand would serve no useful purpose." *Arakas*, 983 F.3d at 111; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003); *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011). Because substantial evidence in the record clearly establishes Shelley C.'s disability, remanding for a rehearing would only "delay justice." *Arakas*, 983

---

[17] Because we have determined that Shelley C.'s disability status should have been granted at step three, we do not address or analyze Paragraph C under step three or steps four and five of 20 C.F.R. § 404.1520(a)(4).

47

F.3d at 105.    We therefore reverse the Commissioner's decision and remand with instructions to grant disability benefits.

*REVERSED AND REMANDED WITH INSTRUCTIONS*