**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-1394**

─────────────

DAWN M. DRUMGOLD,

> Plaintiff – Appellant,

v.

COMMISSIONER OF SOCIAL SECURITY,

> Defendant – Appellee.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Rossie David Alston, Jr.  (1:23-cv-00030-RDA-WEF)

─────────────

Argued:  December 11, 2024                            Decided:  July 18, 2025

─────────────

Before WILKINSON, GREGORY, and RICHARDSON, Circuit Judges.

─────────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Wilkinson joined.  Judge Gregory wrote a dissenting opinion.

─────────────

**ARGUED:** Clifford Michael Farrell, MANRING & FARRELL, Dublin, Ohio, for Appellant. Carolyn Michaela Wesnousky, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Brian C. O'Donnell, Associate General Counsel, David E. Somers, III, Office of Program Litigation, Office of the General Counsel, SOCIAL SECURITY ADMINISTRATION, Baltimore, Maryland; Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Harry Truman, frustrated with his economic advisors explaining "on one hand," this, but also "on the other hand," that, is said to have told his staff to bring him a one-handed economist.[1]  Administrative law judges have no such luxury.  Like President Truman, they must make decisions based on conflicting information.  That's the challenge that the ALJ faced here.  Dawn Drumgold's application for Social Security disability benefits contained some medical records suggesting that her ability to work was significantly impaired, and others concluding that her limitations were only moderate.  Considering the consistency and supportability of these records, the ALJ decided that a mental-health counselor's submissions noting significant impairment were less persuasive than the majority of the other records, which supported less impairment.  Based on this, the ALJ found that Drumgold's functional capacity to work precluded disability benefits.  We find that substantial evidence supported that conclusion.  So we affirm.

I.    **Background**

    A.    **Factual background**

Dawn Drumgold used to work for the Social Security Administration.  She has some history of mental illness.  In 2013, she began feeling "frustration and anger" at work.  J.A. 517.  Then, in 2015, she "snap[ped]" and walked off the job.  *Id.*  Drumgold applied for

---

[1] *See* Steven R. Weisman, *Edwin Nourse, 90, Dies; Truman's Economic Aide*, N.Y. Times, Apr. 10, 1974, at 44.

disability benefits a month later but was denied in 2019.[2]  In 2020 she applied again.  In support of this second application (the one at issue here), Drumgold submitted medical records from her primary-care doctor and her mental-health counselor, along with a report from an independent examiner and reports from two consultants who independently evaluated the medical records.  These sources reached contradictory conclusions about her level of impairment.

### 1.      Drumgold's primary-care doctor: Dr. Sylvia Luther

Drumgold received primary care from Dr. Sylvia Luther.  Dr. Luther's records showed that Drumgold rarely complained of mental-health issues even though she reported a history of depression.  Dr. Luther often assessed that Drumgold had "[n]o anxiety and no depression."  *E.g.*, J.A. 403; J.A. 431.  And she often recorded Drumgold's reported depression as being "in full" or "partial remission."  *E.g.*, J.A. 412; J.A. 409; J.A. 450; J.A. 652.  Even so, Dr. Luther's records contain one note that reflected more serious mental health issues:  In 2020, she observed that "[Drumgold] is still bothered by irrational thoughts of acting out against people. . . . [S]he remains on therapy and on meds. . . . [She is] working on anger management, and she does consider these impulses to be out of character for her."  J.A. 685.

### 2.      Drumgold's mental-health counselor: Shideh Sarmadi

As well as visiting Dr. Luther, Drumgold also participated in therapy with a counselor, Shideh Sarmadi.  Sarmadi submitted two brief letters, dated 2020 and 2021.

---

[2] We omit discussion of this claim because it is not relevant to Drumgold's current challenge except to the extent that it put her on notice of the evidentiary requirements.

3

The 2020 letter stated that Drumgold was receiving therapy for "Depression (Mood Disorder)." J.A. 511. The 2021 letter repeated this observation, adding "Bipolar depressions and PTSD" to the 2020 diagnosis. J.A. 559. Otherwise, the letters are very similar, and both noted that "[o]ur office is unable to release my private notes on therapy session [*sic*] due to HIPPA [*sic*] laws." J.A. 511; J.A. 559.

Along with the 2021 letter, Sarmadi submitted two standardized forms provided by Drumgold's disability advocate. These forms list sets of conditions and symptoms, with check-in-the-box options for their presence and severity. They also provide blank lines for handwritten observations in response to various questions. Sarmadi's responses to the forms' prompts generally indicated that many of the symptoms Drumgold experienced were mild or moderate. But Sarmadi also checked a box marked "recurrent instances of inability to attend work as a result of limitations imposed by depression, anxiety, or other mental health manifestations" and checked another box indicating that this happens "[m]ore than three times a month." J.A. 571. Sarmadi also checked boxes indicating that Drumgold had a "marked" inability (described as a serious limitation) to follow work rules or maintain her personal appearance. And the form further notes that Drumgold was "unable to concentrate or complete tasks due to anxiety, frustration, and anger." J.A. 566 (cleaned up). The form does not indicate the basis for these conclusions.

### 3. A medical examiner: Dr. Carol McCleary

As part of the disability-benefit process, the Social Security Administration referred Drumgold to Dr. Carol McCleary for a comprehensive examination. Dr. McCleary noted that Drumgold showed marked impairments in several areas of occupational functioning—

4

including her ability to maintain regular workplace attendance, complete standard workdays or workweeks, follow supervisory instructions, and engage effectively with coworkers and the public.[3]

But the ALJ found that these indications of impairment are unsupported by the rest of the report, which showed that Drumgold was cooperative; maintained normal affect; seemed "oriented to self, situation, place, and time"; presented normal eye contact; and had average attention, concentration, language skills, and base knowledge.  J.A. 519–20.  Her memory skills, delayed recall, and ability to count money were only "below average" or "moderately compromised."  J.A. 520.

### 4. Two independent medical evaluators: Dr. Montgomery and Dr. McClain

Two experts, Dr. Montgomery and Dr. McClain, reviewed Drumgold's records to determine her level of disability.  Both concluded that she had only moderate limitations, and they agreed that Dr. McCleary overstated the impact of Drumgold's conditions.

Dr. Montgomery agreed that Drumgold had severe "Anxiety and Obsessive-Compulsive Disorders" and "Depressive, Bipolar and Related Disorders."  J.A. 87.  But despite "some limitations in [her] ability to perform work related activities," Drumgold's conditions were not significant enough to prevent her from working.  J.A. 96.  Dr. Montgomery reviewed Dr. McCleary's assessment and found that it was "an overestimate of the severity of [Drumgold's] restrictions/limitations."  J.A. 94.

---

[3] The report defined marked limitations as "[p]roblems that would preclude competitive employment."  J.A. 521.

Dr. McClain, too, acknowledged that Drumgold had significant medical conditions, but "they are not found to be limiting enough to prevent her from performing work." J.A. 104. Dr. McClain further noted that Drumgold's impairments "are not severe enough to prevent her from maintaining day-to-day functioning" and that "claims regarding severity and extent of limitations appear somewhat exaggerated and are not fully supported by the [record]." *Id.*

Dr. McClain also agreed with Dr. Montgomery's description of Dr. McCleary's work, stating that "[Dr. McCleary's] opinion relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." J.A. 105. Dr. McClain further observed that Dr. McCleary's "opinion contains inconsistencies, rendering it less persuasive" and that it "is without substantial support from the medical source who made it, which renders it less persuasive." *Id.* Thus, she reached the same conclusion as Dr. Montgomery about Dr. McCleary's work: that it was "an overestimate of the severity of the individual's restrictions/limitations." *Id.*

## B.     Procedural background

To decide whether she qualified for benefits, the Administrative Law Judge needed to determine Drumgold's residual functional capacity, meaning her ability to do physical and mental work activities on a sustained basis. 20 C.F.R. §§ 404.1505(a), 404.1520(a)(4), -(e), 404.1545.[4] Based on this capacity to work, the ALJ could then evaluate whether

---

[4] This is part of a sequential five-step inquiry: (1) Was the claimant engaged in "substantial gainful activity?" (2) Does the claimant have a "severe" medical impairment? (3) Is the impairment a listed impairment? (4) What is the claimant's residual functional (Continued)

6

Drumgold could do her previous job or other available work. A claimant's residual functional capacity is based "on all the relevant evidence in [the claimant's] case file." 20 C.F.R. § 404.1545(a)(1); *see also id.* § 404.1512(a)(1) (requiring the claimant to submit evidence). Therefore, an ALJ must sort through the record, assessing which pieces are more persuasive than the others.

The ALJ here began by addressing Dr. McCleary's medical-examiner report. The ALJ found it unpersuasive because Dr. McCleary's stated findings did not support her conclusion, which was also inconsistent with the overall record. Turning to Sarmadi's paperwork, the ALJ found it "only partially persuasive" because the counselor's conclusory submission didn't include treatment notes and because her assessment was inconsistent with the majority of the record evidence. J.A. 33. Although Sarmadi claimed that health-privacy laws prevented her from releasing her treatment notes, the ALJ observed that procedures existed for submitting sensitive information. The ALJ also noted that Sarmadi could have submitted a more detailed report summarizing the treatment if she thought that her notes could not be disclosed.[5] "Notwithstanding the lack of supporting documentation," the ALJ observed that Sarmadi's conclusion that Drumgold suffered from "marked mental limitations" was "not consistent with the totality of the evidence" in

---

capacity? (5) Can the claimant perform gainful work in the national economy? 20 C.F.R. § 404.1520(a)(4). Drumgold's appeal turns on the fourth step.

[5] The ALJ also noted that this shouldn't have been news to Drumgold, since the previous 2019 benefits denial had explained to her that health-privacy laws allow providers to submit treatment records with the claimant's permission, or to send a special report.

Drumgold's record.  J.A. 33.  The ALJ instead concluded that Drumgold's limitations were "moderate."  *Id.*

The ALJ was persuaded, however, by Dr. Montgomery and Dr. McClain's work. She was convinced by their findings that Drumgold had only modest limitations, in part because they both cited evidence in support of their conclusions.  In addition, their findings were "generally consistent with the overall record."  J.A. 34.

Taking all this together, the ALJ found that Drumgold could "tolerate a low level of work pressure" and "can work at a consistent pace throughout the workday," while recognizing that Drumgold would struggle with tight deadlines and could not tolerate more than "occasional" and "superficial" interactions with supervisors, coworkers, and the public.  J.A. 26.  In short, although Drumgold did face limitations, she still retained some capacity for work.

Drumgold appealed this decision to the Social Security Appeals Council, which declined to reverse the ALJ.

Drumgold then went to federal district court, which concluded that substantial evidence supported the ALJ's decision.  In particular, the district court stressed that "the ALJ's determination that Ms. Sarmadi's opinions were inconsistent with the record as a whole—focusing in particular on the findings of Drs. Montgomery and McClain but also on the examination conducted by Dr. McLeary . . . was reasonable and supported by substantial evidence."  *Drumgold v. Comm'r Soc. Sec.*, 2024 WL 890535, at *6 (E.D. Va. Mar. 1, 2024).

8

Drumgold timely appealed.[6]

## II.    Discussion

On appeal, Drumgold objects to the limited weight that the ALJ placed on Sarmadi's submissions.[7]  But "[w]e must uphold the ALJ's decision if the ALJ applied correct legal standards and if the factual findings are supported by substantial evidence." *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 382–83 (4th Cir. 2021) (quotation omitted). Substantial evidence, an administrative law "term of art," "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (quotation omitted).  This isn't a high threshold. *Id.* at 103.  We're only looking to make sure that *something* "more than a mere scintilla," *id.* (quotation omitted), supports the decision, because we understand that ALJs are the front-line decisionmakers who are best positioned to decide which pieces of evidence are persuasive and which pieces of evidence are not.

Until 2017, ALJs had to give "controlling weight" to the medical opinion of an applicant's "treating physician" so long as that opinion was "well-supported . . . and [was]

---

[6] We have jurisdiction because Drumgold appeals a district court's "final decision[]." 28 U.S.C. § 1291; *see* 42 U.S.C. § 405(g).

[7] The ALJ's decision shows that she considered Sarmadi's evidence even though she was not required to "specifically refer to every piece of evidence in [her] decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quotation omitted). Sarmadi's letters explained that Drumgold suffered from depression and post-traumatic stress disorder, and the ALJ found that these diagnoses, combined with other clinical findings in the record, showed that Drumgold had "some moderate mental limitations." J.A. 33.  The analysis demonstrates that the ALJ not only considered Sarmadi's work, but in fact incorporated it into her final capacity determination.

not inconsistent with the other substantial evidence in the case record." *Dowling*, 986 F.3d at 384 (cleaned up); *see* 20 C.F.R. § 404.1527(c)(2). The 2017 amendment to the Social Security regulations changed that. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). Under the new rule, ALJs must "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Instead, they "shall consider all evidence available in [the] record," 42 U.S.C. § 423(d)(5)(B), and "evaluate the persuasiveness" of that evidence by applying a five-factor test, 20 C.F.R. § 404.1520c(a); *see also id.* § 404.1520c(b)(2), -(c). The factors are: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors. *Id.* § 404.1520c(c)(1)–(5).[8]

Although the Social Security Administration must ultimately "stat[e] the . . . reason or reasons upon which" its final decision "is based," 42 U.S.C. § 405(b)(1), an ALJ need not explain in detail how he "evaluate[d] the persuasiveness," 20 C.F.R. § 404.1520c(a), of each piece of evidence in the record. The ALJ only needs to say, for each "medical source" in the record, how each of the first two factors applies—that is, whether that source's conclusions are supportable by medical evidence and consistent with the rest of the record. *Id.* § 404.1520c(b)(1), -(2). An ALJ must consider all five factors, but need

---

[8] Both the old and new rules were created by the Social Security Administration in the exercise of its delegated power to make some decisions about how claims will be adjudicated. *See* 42 U.S.C. § 405(a).

not discuss any save the first two unless those other factors are dispositive. *Id.* § 404.1520c(b)(3); *see* 42 U.S.C. § 405(b)(1).

Often, as here, the medical sources arguably point in different directions. Because the ALJ is "[t]he trier of fact," "the duty to resolve" this "conflicting medical evidence" lies with the ALJ. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). When the ALJ does that by applying the correct factors, we won't Monday-morning-quarterback the decision unless it is exceptionally clear that the ALJ made a mistake. "'[W]e do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment' for the ALJ's." *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Thus, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (brackets deleted) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).

At the same time, we ask not just "whether the ALJ examined all relevant evidence" but also whether the ALJ "offered a sufficient rationale in crediting certain evidence and discrediting other evidence." *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 353 (4th Cir. 2023). The reason for this requirement, as in other administrative-law contexts, is that appellate *re*view is possible only when someone has first articulated a *view*. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017). Missing analysis "makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir.

11

2013).  And so we have said that an ALJ must not only reach a conclusion supported by substantial evidence but also "build an accurate and logical bridge from the evidence to their conclusions."  *Arakas*, 983 F.3d at 95 (quotation omitted).[9]

Drumgold's arguments fail because the ALJ reasonably assessed the persuasiveness of Sarmadi's work based on its supportability and consistency.

### A.      Persuasiveness:  supportability and consistency

Under the 2017 rule,[10] ALJs deciding how much weight to give a medical source normally focus on the two factors they are required by rule to explain.  This rule requires that ALJs "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)."  20 C.F.R. § 404.1520c(a).  Instead, the ALJ primarily determines each source's persuasiveness based on its supportability and consistency.  Supportability roughly means the amount of objective medical evidence supporting the medical opinion, and consistency roughly means how well the medical opinion lines up with other material in the record.[11]  Drumgold challenges the ALJ's decision on both of

---

[9] We will not remand a case to the agency unless we not only see an error but find it harmful.  *See, e.g.*, *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015) (explaining that "error[s]" in the "analysis of residual functional capacity" can be "harmless," but that when the ALJ's given reasons have "nothing to do" with its ultimate conclusion, that "lack of explanation requires remand"); *Patterson*, 846 F.3d at 662 (explaining that failure to explain is usually harmful "because such a failure prevents, or at least substantially hinders, judicial review").

[10] Because Drumgold filed her claim after the new rules became effective, it is not subject to the old rule.  *Shelley C.*, 61 F.4th at 354 n.6.

[11] The rule defines supportability in the following way:  "The more relevant the objective medical evidence and supporting explanations presented by a medical source are (Continued)

12

these fronts. Like the ultimate determination that a claimant has or lacks residual functional capacity, we review the subsidiary determination that a medical opinion has or lacks supportability and consistency for substantial evidence. *See Arakas*, 983 F.3d at 106; *Oakes v. Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023).

### B.    Sarmadi's work was not supported by objective medical evidence

The first factor that ALJs are to consider when determining what weight to give a medical source is the extent to which the source supports its opinion with evidence and explains how it arrived at that conclusion. "Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation." *Oakes*, 70 F.4th at 212; 20 C.F.R. § 404.1520c(c)(1) (explaining for the supportability factor that "[t]he more relevant the objective medical evidence and supporting explanations . . . the more persuasive the medical opinions . . . will be."). This makes sense: In disability claims, as in life, opinions are more persuasive when evidence backs them up.

Substantial evidence supports the ALJ's conclusion that Sarmadi's opinion is unpersuasive because she didn't support her opinion with "relevant, objective medical evidence and explanation." Sarmadi included no objective medical *evidence*. Nor did she *explain* how she arrived at her conclusions. Sarmadi sent two, nearly identical, around

---

to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

Consistency is similarly defined: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

13

300-word letters, and she attached some check-the-box forms to the second letter. These forms list Sarmadi's conclusion that Drumgold had limitations. But they do not explain why Sarmadi checked the various boxes. Nor did Sarmadi include notes from which her logic could even be inferred. Without more, as the district court explained, Sarmadi's letters were "conclusory and provided without any explanation or support." *Drumgold*, 2024 WL 890535, at *4.

Drumgold replies that Sarmadi's letters deserved more weight because they constituted a "special report" akin to the treatment-notes alternative the ALJ had suggested. It is true that a "fact sheet" suggests that medical providers may submit redacted versions of their psychotherapy notes, or alternatively, to provide "a special report detailing the critical current and longitudinal aspects of [the] patient's treatment and their functional status."[12] Sarmadi's conclusory submissions fail to *detail* anything, much less the critical current and longitudinal aspects of Drumgold's treatment and her functional status. But even if Sarmadi's submission constituted a "special report," it remains a form of medical opinion. And medical opinions must be evaluated for their supportability. 20 C.F.R. § 404.1520c(b)(2). Merely attaching a label does not bypass consideration of the opinion's supportability (or of its consistency). As Sarmadi's cursory submissions came with no evidence and no explanation, the ALJ reasonably concluded they lacked support and afforded them little weight.

---

[12] Social Security Administration, Fact Sheet for Mental Health Care Professionals, Publication No. 64-103 (Jan. 2008).

14

### C.    Sarmadi's letters were inconsistent with the weight of the record

The other factor that Drumgold challenges is the consistency of Sarmadi's report with the rest of the record. *See Oakes*, 70 F.4th at 212 ("[C]onsistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record."). Like supportability, consistency also makes sense: If a host of sources say one thing, but a single source says something different, then one should question the reliability of the contradictory source.

Here, substantial evidence supports the conclusion that Sarmadi's conclusory assessment was contradicted by the weight of the other evidence. Dr. Luther's medical records show that Drumgold rarely complained of symptoms from depression, usually because it was in remission. Likewise, Dr. Montgomery and Dr. McClain, the two experts who evaluated the records, thought that Drumgold's symptoms were not bad enough to keep her from working.

The ALJ was correct to recognize the inconsistency. She concluded that "[n]otwithstanding the lack of supporting documentation, Ms. Sarmadi's opinions that the claimant has marked mental limitations are not consistent with the totality of the evidence, which demonstrates routine and conservative mental health treatment and the claimant's ability to engage in many activities of daily living." J.A. 33. The ALJ then followed this statement with a citation to conflicting evidence: Drumgold's disability application where she explained her daily routine, treatment records showing that Drumgold's depression was

15

in remission, Sarmadi's first letter, Dr. McCleary's report, and the recording of a hearing that the ALJ had held with Drumgold.[13]

Drumgold counters that the ALJ's characterization of her treatment as "routine and conservative" underestimates the severity of her limitations. J.A. 33. But substantial evidence supports that characterization: The treatment was a typical course of care for her conditions.[14] This ordinary care was consistent with the moderate limitations the record elsewhere described, and by the same token that treatment was inconsistent with Sarmadi's (unsupported) view that Drumgold was markedly impaired.

Drumgold also complains that the ALJ should not have considered her daily activities. But as the Social Security rules explain, "daily activities" are one of the "factors relevant to your symptoms . . . which we will consider" when making the residual functional capacity determination. 20 C.F.R. § 404.1529(c)(3). While it's true that ALJs should not "penalize[]" claimants for "attempting to lead normal lives in the face of their

---

[13] Unlike *Radford*, where the ALJ's mere citation to medical records did "not indicate *why* the opinions merit[ed] . . . weight," 734 F.3d at 295, here, the ALJ's conclusion and citation came with pages of analysis about the persuasiveness and findings of the other medical records.

[14] The use of the term "routine and conservative" here differs from that in *Shelley C.*, 61 F.4th at 355. There, the issue was that the plaintiff's treatment was neither routine nor conservative, because she had undergone 36 rounds of a treatment "offered only to patients with the most severe, resistant cases" in a "rigorous treatment program" after an intentional overdose. *Id.* By contrast, Drumgold's treatment was ordinary: therapy and antidepressant medication prescribed by doctors who noted that her symptoms were in remission. Drumgold fails to explain why this was more than the routine and conservative treatment described by the ALJ.

16

limitations," *Oakes*, 70 F.4th at 216 (quotation omitted), that does not mean that a claimant's activities may not be considered as part of the totality of the evidence.[15]

In *Oakes*, we considered a claimant whose only medical evidence consisted of two emergency-room visits. *See* 70 F.4th at 211. Because the record was "exceedingly sparse," *id.* at 210, the ALJ ordered a consultative examination to resolve the ambiguity created by the lack of evidence, *id.* at 213. But then the ALJ discounted the examiner's findings. *Id.* at 213–14. Rather than order another inquiry, *id.* at 214–15, the ALJ improperly relied on limited information about the claimant's daily activities to conclude that the examiner's opinion was unpersuasive, *id.* at 216. And after rejecting that opinion because it was inconsistent with the claimant's daily activities, the ALJ reached a capacity determination. *Id.* at 216. In short, the claimant's activities were the primary evidence that the *Oakes* ALJ relied on to discount the only independent examination report and arrive at the residual functional capacity determination.

By contrast, Drumgold's ALJ did not improperly use her daily activities to discount an independent consultative examiner's findings. Rather, the judge gave less credence to Drumgold's therapist's conclusions because they were inconsistent with the bulk of the other evidence, which included Drumgold's reported daily activities *as well as* years of medical records and the reasoned conclusions of an independent examiner and two

---

[15] If an ALJ examines the sorts of activities that a claimant performs, the ALJ must also consider "the *extent* to which [the claimant] can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). The *Oakes* ALJ failed to do so, and so that use of daily activities was doubly improper. 70 F.4th at 216. Drumgold claims only that the ALJ's use of her daily activities was erroneous and not that the ALJ should also have considered their extent.

independent evaluators.  The ALJ did not improperly extrapolate from daily activities to functional capacity, *see Oakes*, 70 F.4th at 216, but properly discounted one medical opinion based on others—and then reached a capacity determination based on the whole mix of record evidence.

Substantial evidence thus supported the determination that Sarmadi's work was inconsistent with the totality of the record.

*          *          *

Drumgold's disability application presented conflicting evidence.  Some of her medical records showed mild impairment, but others suggested that she was more heavily burdened.  Unlike President Truman, the ALJ couldn't just demand a one-handed economist.  Instead, she needed to weigh the evidence and decide which reports were more convincing than others.  She did that, and substantial evidence supported her judgment.  So the district court's decision recognizing as much is

*AFFIRMED*.

18

GREGORY, Circuit Judge, dissenting:

The majority has found that the ALJ's denial of social security benefits was warranted because "the ALJ reasonably assessed the persuasiveness of Sarmadi's work based on its supportability and consistency." Maj. Op. at 12. But I differ from the majority's reasoning, and therefore dissent.

To begin, supportability and consistency are the "most important factors" an ALJ considers when determining how much weight, if any, to give a medical source. 20 C.F.R. § 416.920c(a). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." *Id.* § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 416.920c(c)(2).

Contrary to the majority's holding, the ALJ failed to assess the persuasiveness of Sarmadi's work based on its supportability and consistency. With respect to supportability, the ALJ found Sarmadi "did not provide a special report with a detailed description of the current and longitudinal aspects of her treatment notes and their functional status in accordance with agency regulations." J.A. 33. But not so. Sarmadi explained in two special reports in July 2020 and October 2021 that she had been providing mental health counseling to Drumgold since October 2015. J.A. 511, 559. Sarmadi further explained, amongst other things, that "[d]uring the course of therapy and [her] interaction with [] Drumgold, [she] came to realize [Drumgold] [was] dealing . . . with Bipolar Depression

19

due to her frequent labile mood and lack of impulse control and reported frequent mood swings." *Id*. Sarmadi also found that Drumgold was "highly excitable and irritable at times and can be easily triggered by environmental stimulation and her surroundings including people and driving in heavy traffic." *Id*. Sarmadi concluded her reports by recommending that Drumgold "maintain her treatment as scheduled" and "continue therapy and avoid situations that are triggering for her and makes her angry." *Id*. These special reports prepared by Sarmadi are enough to meet the agency regulations, which only require that a special report "detail[] the critical current and longitudinal aspects of [a] patient's treatment and their functional status."[*] In other words, Sarmadi detailed the critical current and longitudinal aspects of Drumgold's treatment and her functional status—namely, by stating that she had treated Drumgold for approximately five years, determined that Drumgold suffered from Bipolar Depression which made her more susceptible to lack of impulse control and mood swings, and ultimately concluded that, in the future, Drumgold should maintain treatment, continue therapy, and avoid triggering situations. It is unclear what more Sarmadi could have written in her special report to warrant consideration from the ALJ.

My colleagues in the majority find, amongst other things, that Sarmadi's special reports were conclusory and failed to "*explain* how [Sarmadi] arrived at her conclusions." Maj. Op. at 13 (emphasis in original). But such a holding not only goes against the plain

---

[*] Fact Sheet For Mental Health Care Professionals, Supporting Individuals' Social Security Disability Claims, https://www.ssa.gov/disability/professionals/mentalhealthprof facts.htm, https://perma.cc/VGN7-3V9X, (last visited July 2, 2025).

language of what the agency requires of special reports but directly contradicts the reason as to why a special report is submitted in the first place, i.e., in lieu of submitting a detailed report so a patient does not have to reveal intimate details about her mental health history. Such a holding may also have an unintended impact of penalizing Drumgold for wanting to seal her mental health psychotherapy notes, and penalizing Sarmadi for abiding by her client's wishes and overarching HIPPA laws. Interestingly, the majority cites no authority—controlling, persuasive, or otherwise—that has required such a high bar for a special report to be considered and has not pointed to any agency regulations that has said as much. And nor could they. In any event, the ALJ failed to assess the persuasiveness of Sarmadi's work based on supportability.

While I would reverse and remand on the basis of supportability alone, the ALJ's errors did not stop there. With respect to consistency, the ALJ found that "[n]otwithstanding the lack of supporting documentation, Ms. Sarmadi's opinions that [Drumgold] has marked limitations are not consistent with the totality of the evidence, which demonstrates routine and conservative mental health treatment and the claimant's ability to engage in many activities of daily living," J.A. 33. But again, not so. Regarding Drumgold's alleged "conservative mental health treatment," the ALJ failed to "build an accurate and logical bridge from the evidence to [her] conclusion." *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023). Specifically, the ALJ failed to explain why the treatment Drumgold received was lacking or provide any explanation as to what was necessary for Drumgold's treatment to be classified as more than conservative care. The ALJ's conclusions regarding Drumgold's ability to engage in "many activities of daily living"

21

suffer from similar deficiencies. While the ALJ found Drumgold could perform daily activities such as driving, shopping in stores, counting change, and watching television, J.A. 24, the ALJ failed to explain how Drumgold's ability to carry out these daily activities translates to a full workday, or was inconsistent with Samardi's special reports, or Drumgold's assertion that she is unable to sustain full-time work. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 101 (4th Cir. 2020) (finding "[a] claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities" and as such, "substantial evidence does not support the ALJ's conclusion" to the contrary). Hence, the ALJ failed to assess the persuasiveness of Sarmadi's work based on consistency.

All these shortcomings by the ALJ preclude meaningful review of the decision to deny Drumgold benefits. Accordingly, I dissent.